392 So.2d 1099 (1980)
William T. WALLER et al.,
v.
FARMLAND INDUSTRIES, INC. et al.
No. 7843.
Court of Appeal of Louisiana, Third Circuit.
December 17, 1980.
Rehearing Denied February 9, 1981.
*1100 Kramer & Laird, Bernard Kramer, Alexandria, for plaintiffs-appellants.
Gold, Little, Simon, Weems & Bruser, Edward E. Rundell, Alexandria, for defendants-appellees.
Before FORET, STOKER and LABORDE, JJ.
STOKER, Judge.
This is a personal injury suit brought by two pipe fitter-welders against Farmland Industries, Inc., (Farmland) and its employee Jewell Jackson. Farmland is a fertilizer manufacturer. The injuries causing the damages for which plaintiffs seek recovery occurred at a fertilizer plant owned by Farmland which was nearing completion at Pollock in Grant Parish, Louisiana. Plaintiffs William T. Waller and Donald Jones were construction workers for a company sometimes referred to as Pullman-Kellogg Contracting Company and also at times as M. W. Kellogg Company, a division of Pullman, Inc. Plaintiffs were injured in an accident which occurred on March 19, 1977, while attempting to remove an obstruction referred to as a "blind" in a ten inch pipeline which was a part of the plant facility.
Plaintiffs have pled that Farmland is liable to them for the damages sustained by them in the explosion on the grounds of strict liability and negligence.
The first line of defense adopted by Farmland and Jewell T. Jackson is that the petition fails to set forth a cause of action against them. Plaintiffs were employees of M. W. Kellogg Company (hereinafter referred to as Pullman-Kellogg). Pullman-Kellogg designed the fertilizer plant and constructed it. The plant was being turned *1101 over to Farmland in stages as portions of the plant were completed. The area of the plant where the explosion and subsequent fire occurred had been tendered by Pullman-Kellogg to Farmland as completed and start-up operations had actually been commenced by Farmland at the time of the explosion. In the process of the start-up an obstruction was discovered by Farmland officials or employees. Pullman-Kellogg was requested to remove the blind causing the obstruction. Plaintiffs as employees of Pullman-Kellogg were involved in opening a flange in the ten inch pipe referred to above. The explosion and fire occurred when a welding torch or cutting torch was used in an attempt to remove a bolt on the flange.
Under the circumstances related above, Pullman-Kellogg and Jewell T. Jackson filed a peremptory exception of "no right or cause of action". The exception was grounded on the allegation that a contract for the work in question existed between Farmland and Pullman-Kellogg and that a relationship of principal-contractor existed between them. Further, they urge that the work contracted by Farmland to Pullman-Kellogg was a normal and integral part of the trade, business and occupation of Farmland. Therefore, it was alleged by exceptors that Farmland was a "principal" in the meaning of LSA-R.S. 23:1032 and LSA-R.S. 23:1061 and that plaintiffs were the statutory employees of Farmland with all rights against Farmland governed by the workmen's compensation law of this state. Therefore, it is urged that plaintiffs' exclusive remedy against Farmland would be in workmen's compensation, thus barring any action in tort by them against Farmland. It is alleged that Jackson was at all times an employee of Farmland within the meaning of LSA-R.S. 23:1032 and that he is immune from civil suit. Through joint stipulation of the parties filed in the record it was stipulated that the court's ruling on the peremptory exception should be referred to the merits of the case and tried as a part of the merits. Hence, the defense of exclusiveness of remedy under the workmen's compensation law is an issue in this case.
Farmland and Jewell Jackson filed an answer denying any negligence on their part in which they reiterated the defense of exclusiveness of remedy. The defendants set up the special defenses of contributory negligence on the part of the plaintiffs and also the defense of assumption of the risk.
The trial judge found that the explosion did not occur as a result of the negligence of Farmland or Jackson. It rendered judgment against the plaintiffs rejecting their demands. In this appeal the plaintiffs-appellants specify the following errors on the part of the trial court:
(1) Failure to specifically overrule the exception of exclusiveness of remedy.
(2) Finding that Farmland was not guilty of negligence under Article 2315 of the Louisiana Civil Code.
(3) Treating the case solely as one of negligence under Article 2315 of the Louisiana Civil Code instead of a case to be considered as governed by Article 2317 of the Louisiana Civil Code.
Before us the defendants-appellees, Farmland and Jackson, contend that the trial court was correct in finding no negligence on their part. Alternatively, they contend that their defenses of contributory negligence and alternatively assumption of the risk are good defenses. Specifically the defendants-appellees contend with respect to LSA-C.C. art. 2317 that the plaintiffs failed to prove a vice or defect in the design of construction of the plant. The reliance of the plaintiffs-appellants on LSA-C.C. art. 2317 focuses on the interpretation of that article of the Civil Code as announced in Loescher v. Parr, 324 So.2d 441 (La.1975). The defense of lack of vice or defect in the design of construction of the plant is predicated on the necessity for such before liability may be imposed under Article 2317 of the Civil Code. As additional defenses to liability under Article 2317 defendants-appellees contend that the accident resulted from the fault of a third person, namely *1102 Alan Lasher. Finally, as above observed, the exclusiveness of remedy defense is still part of this appeal.

FACTS
The Farmland plant where the accident in question took place was designed and was being built by Pullman-Kellogg. Farmland has numerous other plants at various other locations. This particular plant was designed to produce anhydrous ammonia which is used as a fertilizer in growing agricultural crops. Various portions or sections of the plant were turned over to Farmland by Pullman-Kellogg as completed. The particular area in question had just been completed but was not producing ammonia at the time of the accident. This area had been tendered by Pullman-Kellogg to Farmland for acceptance on March 19, 1977. Farmland was beginning what was referred to as "start-up" operations. This merely means that Farmland with the assistance of a special group of Pullman-Kellogg people commenced operation of this portion of the plant. The Pullman-Kellogg people who assisted in the start-up operation were apparently referred to by some as "commission men" meaning that they were there to assist in putting this portion of the plant in operation as distinguished from those Pullman-Kellogg people who were involved in construction. These commission men were assisting in putting this portion of the plant into "commission".
The defendant Jewell Jackson as an employee of Farmland had the classification of Daylight Supervisor. He had various duties but basically he was a go-between between shift supervisors and the operations superintendent of the plant. One of his duties was to coordinate between the supervision of Farmland and the supervision of Pullman-Kellogg. In other words, he functioned in a liaison capacity. Jackson's immediate supervisor was Sidney H. Sanderson. Sidney Sanderson bore the title of Operations Superintendent for Farmland. His duties included seeing that the plant was successfully started up. On the morning in question Jackson reported to Sanderson that he had discovered a blind in a flow pipe which required removal before the new part of the plant being put in operation would be operational. Start-up operations had already begun.
Sanderson held a discussion with his superior and it was decided that, inasmuch as the construction contract between Farmland and Pullman-Kellogg placed responsibility on the latter for removal of the blind, Pullman-Kellogg would be requested to remove the blind.[1] Sanderson went to see one Mike Silvers and one Red Powers with Pullman-Kellogg and requested that they remove the blind. Mike Silvers was Kellogg's resident construction manager and Red Powers was Kellogg's chief starter operator. Silvers was the top man for Pullman-Kellogg on the job.
At this point, it is necessary to describe as nontechnically as we can the mechanics and layout of the portion of the plant's system which bore relationship to the area where the blind had been located. For this purpose we have adapted a schematic diagram from Exhibit P-9 submitted on behalf of the plaintiffs. This schematic design is attached to this opinion as Exhibit 1 and is designated as "Schematic Design of Portion of Plant of Farmland Industries, Inc.".
*1103 
*1104 Anhydrous ammonia is manufactured from natural gas. Although we do not understand the process of manufacture in Farmland's plant, the evidence indicates that natural gas is injected into flow pipes at a point marked "D" on the schematic design from a structure referred to as the 108D zinc oxide vessel. From point "D" the natural gas proceeds in the direction indicated by the arrow to point "C" past point "F" and finally out into the atmosphere at point "G". As shown on the left side of the sketch at point "A" and "B" another structure is located which we understand is referred to as a shift converter consisting of a high shift and a low shift. Pipes or vent headers run from the high shift and low shift portions of the shift converter and ultimately lead to the opening to the atmosphere. The pipe or vent header for the high shift leaves at point "B", proceeds to point "F" as indicated by the arrows on the sketch, and from point "F" proceeds on to point "G". That steam which comes from the high shift then emits into the atmosphere at point "G". Under normal circumstances the material or substance which is emitted by the low shift goes into the low shift vent header at point "A", proceeds to point "C", passes point "F" and flows on to point "G" for release into the atmosphere. The normal direction of flow from the low shift to the atmosphere (from point "A" to point "G") is shown on Exhibit 1 by a dotted line with directional arrows and is designated as "normal direction of flow". The blind which was discovered by Jewell Jackson is indicated by the circle between point "A" and "G" and is marked as "Blind" with an arrow pointing to it indicating "fire and explosion".
This blind consisted of a round piece of thick steel. The purpose of such a blind is to close off a line at a particular point so that the flow is interrupted at that particular point. This blind was located, apparently, at a connection between two lines where the connection was made by a flange or flanges. A number of large bolts bolted the flanges together. In order to take out the blind it was necessary to unscrew the bolts, spread the flanges with a device referred to as a flange spreader and then remove the blind.
The request from Sanderson to remove the blind went to the Pullman-Kellogg organizational command and was transmitted to one Alan Lasher who was a start-up advisor for Pullman-Kellogg. He was asked to obtain a crew of pipe fitters to pull the blind. For this purpose he went to the general foreman of the pipe fitters. The crew was provided and included both of the plaintiffs in this case, Donald Jones and William Waller. Lasher testified that he together with Bill Vining, also a start-up advisor for Pullman-Kellogg, and two pipe fitters who were never identified then went to the area of the blind. Lasher testified that he told the two pipe fitters what was to be done and also informed them that natural gas was in the line. Thereafter Lasher's only job was to generally "overlook the job".
Some considerable evidence was taken on the question of whether or not defendant Jewell Jackson or any other Farmland personnel were present at this time. There is no question that Jewell Jackson was present at some time when the pipe fitter crew began their operations. Whether or not he was there at the precise moment of the explosion is in dispute. Jackson testified that early in the morning he had checked the lines and there was no gas in the lines. Perhaps this point is immaterial because the start-up operation itself required the injection of natural gas into the system at point "D". Also the testimony of both Alan Lasher and Sidney Sanderson is to the effect that natural gas was in the line at the time of the explosion. The fact that the explosion took place is moot testimony of the fact that some explosive material was in the line. Otherwise the explosion and fire would not have taken place.
Both of the plaintiffs in this case deny that they were ever advised that natural gas was contained within the line in which the blind was located. This particular line as indicated on Exhibit 1 was a ten inch line and was referred to as the low shift vent header. The gas in question ran from point *1105 "C" back to the point where the blind was located.
It is undisputed that gas was in the low shift vent header line. There is also no question that this fact was known by Sidney Sanderson, the Operations Superintendent of Farmland, and all of the Pullman-Kellogg people who were involved in the start-up process. The very process of starting up the plant required natural gas to be induced into the system, a fact well understood by the Farmland personnel and those involved in commissioning or starting up the plant who were employees of Pullman-Kellogg.
A great deal of testimony was taken by both sides from Jewell Jackson concerning whether he knew or did not know that gas was in the pipe at the time the efforts were begun to remove the blind. We regard this as immaterial in view of the disposition we make of the case. It should be noted, however, that the construction workers employed by Pullman-Kellogg and the socalled commission men involved in the start-up operation were involved in the entire process. As we appreciate the evidence, there would be no particular reason for the pipe fitters who were a part of the construction operation to know anything about the start-up operations and particularly that gas had been induced into the system. Despite the fact that Alan Lasher stoutly maintains that he told two pipe fitters who were part of the crew that there was gas in the line, there is no proof in the record that either of the plaintiffs knew there was gas in the line.
After having been directed to do so, the crew of pipe fitters and welders began to remove the bolts from the flanges where the blind was located. Various types of wrenches were used in this operation. All went well until the last bolt was reached. Before this last bolt was reached a gaseous substance had begun to blow from the opening made by separating the two flanges. Jewell Jackson seems to have been present at some time when the operation of removing the blind was started, but he was of the impression that the substance was steam. His explanation is that he had checked the line in the morning and that no gas was present. Apparently the pipe fitter crew assumed that they were confronted with steam only. The steam did pose something of a problem because of its force and the possibility of being injured by the heat and force of the steam.
For some reason the last bolt did not respond to the mechanical efforts and use of the hand tools. It was then suggested that a welding torch or cutting torch be used to cut it loose. Someone made the decision to do this and the cutting torch was brought to the work site. When the welding torch was ignited, the explosion took place and a fire resulted. Both of the plaintiffs were seriously injured.
Jackson testified that he was not present when the cutting torch was brought up but was in the control room in another part of the area. Alan Lasher was present and was within ten feet of the explosion. After the explosion Jackson determined that the natural gas was coming from the 108D zinc oxide vessel by means of shutting off certain valves. Jackson also stopped the fire through this means. Jackson testified that the steam running in the pipe designated as "SP-71 vent header" was proceeding from point "B" with the eventual intention that it be emitted into the atmosphere. It is apparent that at some time prior to the time that the operations were begun to remove the blind natural gas had moved from the 108D zinc oxide vessel at point "D" to point "C" at which time it moved backwards against the normal direction of flow in the low shift vent header and towards the blind. After the flange was open there would be a release of pressure which would tend to draw out the contents from the pipe or afford an additional reason for the natural gas to move from point "C" toward the blind rather than moving out into the atmosphere.
Pertinent testimony of Jewell Jackson concerning some of these points as recorded on page 82 of the transcript is as follows:
"Q. ... the normal flow in the low shift vent header is to the atmosphere, isn't it? *1106 A. Yes.
Q. The natural gas that was being backed down the low shift vent header in a direction that these, this direction of flow shows, it was going backward, wasn't it?
A. Yes.
Q. ... And that's how the natural gas got there?
A. Yes.
Q. ... And you didn't know that would happen until after the fire started?
A. I didn't know there was gas there.
Q. Did you determine what had actually happened by turning off valves and stopping the fire afterwards?
A. Yes.
Q. Who, what employees were responsible for operating the valves and maintaining the flow of any gaseous material in those lines, Farmland's employees or Pullman-Kellogg's employees?
A. You're talking about the actual flow of the gases and valving?
Q. Yes.
A. Farmland."
The explanation as to why the natural gas was in the low shift vent header, that is the area between the blind and point "C", is reasonably clear. Steam was flowing through the SP-71 vent header proceeding from point "B". Natural gas was flowing from the 108D zinc oxide vessel from point "D" to point "C" and then toward the blind. This was the result of steam pressure from point "F". The tendency of the natural gas when it reached point "C" would be to seek the line of least resistance. Testimony to this effect was given to corroborate this fact. Therefore, natural gas under pressure from point "D" would proceed both to point "F" and backwards from point "C" in a direction toward the blind. For gas to proceed from point "C" "backwards" toward the blind constituted a flow contrary to the normal intended direction of flow.
It is quite evident that the blind served some temporary purpose and had apparently been forgotten when the area in question was tendered by Pullman-Kellogg to Farmland. As an obstruction in the low shift header line, the blind constituted a defect when the attempt was made to make this portion of the plant operational through the start-up efforts. Hence, the removal of the blind was referred back to the construction personnel of Pullman-Kellogg. As we have noted the plant in its entirety was designed by Pullman-Kellogg. It was also entirely constructed by Pullman-Kellogg. Irrespective of this fact, the plant had been turned over, or to use the words of the witnesses, had been tendered to Farmland. In starting up its operations, we conclude that Farmland had taken custody and control of this part of the plant. Irrespective of the fact that it had nothing to do with the design of the plant or the construction of it, it nevertheless had control and custody of the plant with a blind in place which resulted in natural gas flowing into the low shift vent header contrary to normal intentions so as to create a hazard and risk at the site of the blind when the attempt was made to remove it.

THE CONTROL ELEMENT OF ARTICLE 2317
We will pretermit the question of negligent fault on the part of the defendants for the reason that we believe this matter may be disposed of on the basis of non-negligent fault as provided in Article 2317 of the Louisiana Civil Code. Article 2317 (LSA-C.C. art. 2317) regulates responsibility for acts of others and of things in our custody. The article provides as follows:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
As construed in Loescher v. Parr, supra, we believe that the element of guardianship, custody or control has been *1107 established in this case. Loescher v. Parr, supra, makes it clear that liability results from mere guardianship or custody of the risk-creating thing or person. It stated that the legal fault thus arising is sometimes referred to as strict liability. It is in fact fault without negligence. In discussing other articles of the Louisiana Civil Code in which this principle had already been applied, the author of the opinion set forth the following rationale for application or determination of this type of non-negligent fault:
"When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect creates an unreasonable risk of injuries to others.
The fault of the person thus liable is based upon his failure to prevent the person or thing for whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. His fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible) which creates the unreasonable risk of harm to others."
In the case before us, even if we consider that Pullman-Kellogg had guardianship, custody or control of the area where the blind was located, that is the flanges being handled and spread by the crew of pipe fitter-welders, this does not affect the liability of Farmland. It is clear that the presence of the natural gas at the site of the blind proceeded from apparatus within the control of Farmland. It had control of the natural gas; it had control of the valves or other controls which permitted the flow of the natural gas into the pipe system; it had control of the low shift vent header.
The description of the role of the so-called commission men of Pullman-Kellogg would indicate that their purpose was to advise and assist Farmland in starting up the new plant facilities. Under such an arrangement, even if it be considered that Pullman-Kellogg had joint control with Farmland, it would not alter our decision in this matter. It is our belief, however, that Farmland had control rather than divided control. Furthermore, it is immaterial that the defect built in by the leaving of the blind in place and any defects which may have existed as a result of design originated with Pullman-Kellogg. These defects were in the plant facilities over which Farmland had taken control. Regardless of who was responsible for the defect, they were under the guardianship of Farmland up to the time that the pipe fitter crew was called in. As noted previously, irrespective of how the matter of control of the area of the pipe where the blind was located is resolved, it was the system which put the gas in proximity to the flange.

VICE OR DEFECT UNDER ARTICLE 2317
Defendants vigorously contested the notion that any defect or vice as required by LSA-C.C. art. 2317 existed in this system or the facilities. We are convinced that the facts recited above and the analysis that we have gone through make it clear that such a vice or defect existed. In applying the rationale of Loescher v. Parr, supra, as it construes Article 2317 of the Louisiana Civil Code, it must be recalled that negligence factors are not at issue. A person who has "the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal act or *1108 inattention on the former's part is proved." Also the defendant's "fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible) which creates an unreasonable risk of harm to others."
Defendants urge alternatively that, if LSA-C.C. art. 2317 should apply, plaintiffs still may not recover under that article because of the specific defenses to this type of liability which have been recognized, namely victim fault and third party fault. Loescher v. Parr, supra, provides that once it is proved that a vice or defect caused damage, "the owner or guardian responsible for the person or thing can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force."
We have been able to perceive no fault on the part of plaintiffs. There is no proof that they knew of the gas in the line at the site of the flanges and the blind. Even if we accept the fact that two pipe fitter-welders were warned of the presence of gas by Alan Lasher, there is no proof that either of these two workers was William Waller or Donald Jones. In their brief defendants urge the defense in terms of contributory negligence and assumption of risk. Without deciding whether victim fault is equated with contributory negligence or assumption of risk, we do not deem either to have existed in fact. There is no proof that plaintiffs should have known or anticipated the presence of the gas. Without knowledge of the presence of the gas we do not see how there could be an assumption of the risk.
We are of the opinion that there is no merit to the defense of third party fault. This defense rests on the argument that the accident was the fault of Pullman-Kellogg. That company designed the facility. It constructed the facility and left the blind in the pipe. Pullman-Kellogg also was in charge of removing the blind and Alan Lasher admittedly was aware of the presence of gas in the pipe. We do not believe these facts constitute a defense. In our discussion of control and custody (guardianship), we have pointed out that Farmland had assumed control of the vices and defects of the system. Assuming there may have been joint control between Farmland and Pullman-Kellogg, we do not consider that divided control would relieve Farmland of responsibility. It is our belief that the references to fault of third persons in Loescher v. Parr contemplate the exclusive fault of a third person, which means that a defendant-guardian or owner must prove the harm was caused, not by his fault in any respect, but, rather, was caused by the fault of a third person or third persons. Cf. Olsen v. Shell Oil Company, 365 So.2d 1285 (La.1978) and Rodrigue v. Dixilun Corporation, 620 F.2d 537 (Fifth Circuit, 1980). Some cases indicate that the fault of the third party need only be a substantial factor in causing harm and not the sole cause. See Kasperski v. Patterson Services, Inc., 371 So.2d 1254 (La.App. 3rd Cir. 1979), writ denied, 373 So.2d 530 (La.1979).
For the foregoing reasons we reject the special defenses to liability based on fault without negligence urged by defendant, namely that the accident was either caused by victim fault or fault of third parties.

FAULT OF JEWELL JACKSON
The foregoing discussion of liability without negligence relates solely to the liability of Farmland. The liability we find under LSA-C.C. art. 2317 cannot result in imposing liability on Jewell Jackson. He was not the owner, guardian or custodian, caretaker or person in control of the Farmland plant facility. Any liability on his part would have to be based on negligent fault. We have not found any conduct of Jewell Jackson which we deem to have been negligence. The only action of Jackson's which we consider may have approached negligence is his assumption that the gaseous substance which blew out of the opening between the pipe flanges was steam. We find nothing in the evidence or testimony which establishes that Jackson owed a duty to know that natural gas was in the pipe *1109 line or that he owed a duty to give the pipe fitter crew any warnings. He was not present when the welding or cutting torch was brought out and did not know gas was in the line until after the explosion. Moreover, Alan Lasher of Pullman-Kellogg knew gas was in the line and we believe that he did tell two members of the crew that gas was in the line.
For these reasons we find no liability on the part of Jewell Jackson.

EXCLUSIVENESS OF REMEDY DEFENSE
No extensive discussion is required with respect to the defense that the exclusive remedy of plaintiffs was in workmen's compensation and therefore they may not maintain this action based on tort liability. The simple and short answer to the defense is that our jurisprudence holds that construction of a new facility is not a part of the trade, business, or occupation of the concern which is to use the facilities. Reeves v. Louisiana and Arkansas Railway Company, 282 So.2d 503 (La.1973); Tuberville v. Georgia Pacific Chemical Co., 385 So.2d 366 (La.App. 1st Cir. 1980); Boudreaux v. Boudreaux, 369 So.2d 1117 (La. App. 1st Cir. 1979); Moak v. Link-Belt Company, 229 So.2d 395 (La.App. 4th Cir. 1969); Ball v. Kaiser Aluminum & Chemical Corporation, 112 So.2d 741 (La.App. Orl. Cir. 1959). Under the circumstances it is our conclusion that the plaintiffs in this case were not the statutory employees of Farmland. Hence, the defense of exclusiveness of remedy under workmen's compensation is not available to defendant.
For the foregoing reasons we find that the trial court was correct in rejecting plaintiffs' demands against Jewell Jackson. As we find liability on the part of Farmland, we will reverse that portion of the trial court's judgment which rejected recovery against that defendant and we will grant recovery against Farmland. This brings us to the assessment of the separate damages of the two plaintiffs in this case.

DAMAGES OF WILLIAM T. WALLER
At the time of the explosion and fire on March 19, 1977, plaintiff William T. Waller was on a scaffold over or about the blind about eight to ten feet above ground. The force of the blast apparently threw Waller to the concrete below. In his fall he may have hit the pipe or some other structure. He was aware of the situation after he was brought to a control room. If he was knocked unconscious, as seems likely, it was not of long duration. Waller was confined to the Rapides General Hospital for approximately ten days primarily for the treatment of severe burns about the face, head, arm and leg.
Waller also sustained injury to his right wrist and right knee. Waller complained of pain in the lumbosacral area of his back but he sustained no fractures or dislocations. Initially there was no complaint as to pain in the neck. On April 4, 1977, Dr. Cappel saw William Waller in his office. Waller was ambulatory and the burns were healing and the skin was beginning to peel. By May 2, 1977, the burns were well healed.
On March 31, 1977, Dr. Joseph Villard saw Mr. Waller. Dr. Villard is a specialist in diseases and surgery of the ears, nose, throat, face, head and neck. Dr. Villard determined that Waller was completely deaf in his left ear and had a 50% loss of hearing in his right ear. This impairment of Mr. Waller's hearing is permanent and cannot be corrected. A hearing aid would not help the left ear. Dr. Villard did not recommend a hearing aid for the right ear because of the complicated procedure involved, although he thought an aid might help to some extent.
Dr. Cappel continued to treat Mr. Waller and saw him on April 4, 18, and 29 and on May 2 and 11, 1977. On April 18, 1977, Dr. Cappel diagnosed Waller's injuries, other than his hearing impairment, as consisting of a contusion to the back and knee and probably a sprained wrist. These injuries were treated symptomatically through the prescription of analgesics and muscle relaxants. By April 29, 1977, Mr. Waller reported that his back was getting worse and he *1110 also complained of pain in the back part of his neck. Waller was essentially the same on May 2. On May 11, 1977, Waller reported he was feeling better and was seeing Dr. John T. Weiss, an orthopedist, concerning his right knee. As the burns were well healed on May 11, 1977, Dr. Cappel released Mr. Waller to Dr. Weiss as he considered his remaining problems to be of an orthopedic nature.
Dr. Cappel next saw Mr. Waller on June 15, 1977, at which time Waller reported that he had been in an automobile accident on June 10, 1977. At that time Waller was driving his automobile and was struck from the rear by another vehicle driven by Duane B. Revoir belonging to Turrentine Company. William T. Waller claimed damages from his accident, principally injury to his neck, and brought a separate suit against the parties alleged to be responsible. That suit was tried before the same trial court which heard this case. Waller recovered a judgment in the suit growing out of the automobile accident, and the defendants in that suit have appealed the judgment.[2] The appeal in that case was docketed to be heard at the same time as Mr. Waller's suit growing out of the explosion and fire. Appeals in both suits are being decided by the same panel of this court.
The occurrence of the second accident has brought on the usual complications of deciding the effect of each accident on Mr. Waller's physical condition, disability and well being.
A further complication in assessing Mr. Waller's claims of back injury arising out of the March 19, 1977, accident result from a confusion between Dr. Cappel and Dr. Weiss as to which doctor was treating Waller for his back problem.
William T. Waller saw Dr. Weiss on May 5, 1977. Dr. Cappel, who was advised of this on May 11, 1977, stated that he released Mr. Waller to Dr. Weiss as his problems then were of an orthopedic nature. Mr. Waller saw Dr. Weiss after the automobile accident on June 24, 1977, but led Dr. Weiss to believe that he was being followed by Dr. Cappel for his injuries sustained in the automobile accident. Hence, Dr. Weiss confined his attention on June 24, 1977, to Waller's knee and wrist. The result was that Dr. Weiss made no assessment of any injuries Waller may have sustained in the automobile accident of June 10, 1977.
It would appear that the wrist and knee complaints of Mr. Waller were not of an incapacitating nature. In this case plaintiff William Waller claims that he is disabled from performing work as a pipe fitter because of injury to his low back or lumbar spine. It is Waller's position, however, that either of the two 1977 accidents would have disabled him. It is his further position that insofar as this suit against Farmland is concerned, it is immaterial that he may have sustained disabling injuries in the automobile accident of June 10, 1977.
In September of 1977, William Waller returned to work as a pipe fitter and worked for Redrock Construction Company during portions of nine months. The hours worked in the various months were as follows:

1977 - September - 95 hours
 October - 24 hours
 November - 131 hours
 December - 124 hours
1978 - January - 128 hours
 February - 147½ hours
 March - 134½ hours
 April - 126½ hours
 May - 32 hours

At this point we will briefly review Mr. Waller's medical history up to the point of the explosion and fire at the Farmland plant on March 19, 1977. Records of the clinic of which Dr. Weiss is a member disclosed that Mr. Waller had a history of lumbosacral and cervical spine problems dating back to 1959. Lumbar disc surgery was performed in 1959. He had very significant persisting back complaints in 1965, 1966, and 1967. Waller sought medical attention *1111 at the clinic of which Dr. Weiss was a member twice in 1965, six times in 1966 and twice in 1967. On June 4, 1971, Waller was in an automobile accident and sustained a sprain of the cervical and lumbar spine. Conservative treatment was administered. In 1971 Waller was seen or treated six times. In October of 1971 Waller complained that he could not do the climbing incident to pipe fitter work. On February 4, 1972, Waller had significant complaints and findings related to his back which he said resulted from heavy work done in Alabama.
Despite the history traced above the evidence does not disclose any treatment of William Waller for lumbosacral problems or cervical spine problems from 1972 until the explosion and fire of March 19, 1977. At that time Mr. Waller was sixty-one years old.
When Dr. Cappel began treating Mr. Waller after his March 19, 1977, accident no initial complaint was made of neck pain and Dr. Cappel did not consider the pain in the low back to be significant. Moreover, the hospital stay for treatment of the burns confined Waller to bed rest and thus acted incidentally as conservative treatment for any back condition. Later on April 29, 1977, Waller mentioned having pain in his neck. Dr. Cappel states that on May 11, 1977, he released Waller to Dr. Weiss.
Dr. Cappel saw Mr. Waller after his June 10, 1977, automobile accident on June 15, 1977. Waller had initially been seen at the emergency room at the Rapides General Hospital. On June 15, 1977, Waller made no complaint of low back pain and his complaints were confined to his neck. Dr. Cappel continued to treat Waller for his cervical or neck injury and saw him on subsequent occasions on June 27, July 12, September 19, October 3, 19, and November 1, 1977. He saw him on February 21, 1978, and last on January 5, 1979.
On June 27, 1977, Dr. Cappel reported that Waller continued to have stiffness and pain in the posterior aspect of the neck. Waller reported that he had developed headaches in the back of his head. Dr. Cappel treated Waller symptomatically with analgesics and muscle relaxants. Waller reported headaches again on July 12, and September 9, 1977. On October 3, 1977, Waller reported pain in the lower portion of his back. He related that he was doing well and had been working for about three weeks. On October 19, 1977, Waller still complained of neck pain but had no back complaint. On November 1, 1977, Waller reported he was doing much better. He had been off work for about three weeks and wanted to return to work. Dr. Cappel approved the return to work. On February 21, 1978, Waller advised Dr. Cappel that he was still working but his neck still troubled him.
In Dr. Cappel's opinion given on June 15, 1977, William Waller was disabled from performing the duties of a pipe fitter from March 19, 1977, (first accident) through the time of the second accident on June 10, 1977. At the time his deposition was taken on March 28, 1979, Dr. Cappel expressed the opinion that both accidents were factors in producing disability. In his opinion Waller eventually wound up disabled, but he stated he did not know how to relate the two accidents to the disability. Both accidents contributed. Contrary to the contentions of Waller, Dr. Cappel did not testify that either accident would have resulted in disability.
Dr. John T. Weiss made an orthopedic examination when he saw William Waller on May 5, 1977. This examination was made at a time between the two accidents. On examination Waller made complaints of tenderness in the lower cervical and upper cervical spine. He had a full range of motion of the neck, but Waller complained of a popping and discomfort on extreme motion. In examining Waller's back he exhibited some discomfort in the mid and lower lumbar region. There was a suggestion of positive straight leg raising on the right at 60 degrees. There was irritation in Waller's right wrist and vague pain around the right knee but no effusion or instability.
X-ray examination by Dr. Weiss disclosed marginal cervical arthritic change (termed *1112 spondylitis by Dr. Weiss). Also there was some degenerative disc disease in the lower cervical spine. X-rays of the lumber spine showed some mild spondylitis and mild space narrowing at the lumbar level.
On May 5, 1977, Dr. Weiss was of the impression that William Waller had a lumbar spondylitis, or arthritic change in his lumbar spine; degenerative disc disease in the cervical spine; the right wrist would not be a serious problem and was probably only a contusion; Dr. Weiss made no further check of the knee at that time. In his deposition testimony Dr. Weiss stated he had no way of making a diagnosis as to whether Waller had sustained a lumbosacral sprain or any kind of soft tissue injury to the lumbar spine because he did not know what Waller's back condition was before the explosion accident. However, from the history given him he thought it apparent that the explosion accident did aggravate Waller's back condition. The accident historybeing blown off a scaffold eight to ten feet off the ground and striking a concrete surface and pipingwas compatible with aggravation of a pre-existing arthritis, or spondylitis, and degenerative disc disease.
Dr. Weiss treated Waller symptomatically on May 5, 1977, and prescribed muscle relaxants and a mild analgesic as medication and use of a lumbosacral corset. On May 5, 1977, it was Dr. Weiss' opinion that William Waller was not able to perform the duties of a pipe fitter.
On May 20, 1977, Dr. Weiss saw Waller again. The right wrist was still sore but there was no swelling. An orthogram of the knee disclosed no tears inside the knee. Repeated x-rays of the neck did not change Dr. Weiss' opinion as to the neck. The x-rays of the cervical spine showed some degenerative disc disease but there did not appear to be any nerve root involvement. On May 20, 1977, Dr. Weiss was still of the opinion that William Waller was unable to work as a pipe fitter.
Dr. Weiss saw Waller on June 24, 1977, which was shortly after Waller's automobile accident. Dr. Weiss states Waller told him that Dr. Cappel was treating him for his back. As a consequence Dr. Weiss confined his examination to Waller's knee and wrist, primarily the wrist. Dr. Weiss testified that the wrist problem on June 24, 1977, would not have prevented Waller from working. Dr. Weiss declined to give an opinion as to Waller's back on June 24, 1977, because he did not examine the back on the assumption that Dr. Cappel was treating Waller for the back. Dr. Weiss did testify that he found sufficient back pathology on June 24, 1977, to warrant treatment by an orthopedist.[3] Apparently Dr. Weiss did not examine Waller's cervical spine either. He had previously prescribed anti-arthritic medicationNaporosyn and Ascriptin A.D.and advised him to continue with this.
As noted above William Waller returned to work in September of 1977, and worked through April of 1978 and thirty-two hours in May of 1978.
On April 11, 1978, William Waller returned to Dr. Weiss. He complained of still having soreness in the right wrist, of catching in his low back and some problem in moving around because of this. There was vague soreness and deep palpation of the mid and lower lumbar spines. X-rays showed some narrowing of spaces in the lumbar region and also moderate osteoarthritic spurring. Waller told Dr. Weiss that working gave him trouble. At this time, April 11, 1978, Dr. Weiss recommended that Waller consult Dr. John M. Patton, a neurosurgeon.
Dr. Weiss last saw Waller on January 23, 1979, but he did not treat him as he was then seeing Dr. Patton. As of January 23, 1979, Dr. Weiss was of the opinion that Waller was unable to work and that his degenerative disc disease was progressing.
*1113 In summary, Dr. Weiss declined to give any testimony concerning William Waller's back condition following the automobile accident on June 10, 1977. He thought that the lumbar spondylitis, or arthritic change, and the condition caused by degenerative disc disease of the spine which he found on May 5, 1977, were more likely to have occurred whether or not Waller had been involved in the explosion accident. These conditions would have resulted from the natural aging process. However, Dr. Weiss testified that the severity of the condition may be hastened by trauma and Waller did state to him that the condition became a lot worse symptomatically after the explosion accident. Dr. Weiss specifically stated that he could not evaluate the "percentage involvement" of Waller's troubles stemming from the March 1977 explosion accident and the June 1977 automobile accident because he did not examine him for injury sustained in the automobile accident.
Dr. John M. Patton gave William Waller a neurological examination on April 14, 1978. Dr. Patton was able to produce pain in Waller's neck but there was no radiation of pain in the arms. This usually indicates that the source of the pain is in bone or ligamentous structures and that there is no nerve pressure. From x-ray film from Dr. Weiss' office Dr. Patton noted extensive degenerative joint disease involving both the lumbar spine and cervical spine. Dr. Patton elected to treat Waller as conservatively as possible and on May 3, 1978, performed a myelogram. The myelogram test indicated that Waller had cervical and lumbar spondylosis. Dr. Patton described the results of the test by saying that "Waller had one of the most severe myelograms I have ever seen." Every joint looked at was affected by "very bad disease".
Dr. Patton testified that Waller had no problems as a result of his condition except pain. The pain was being produced from so many joints that surgical relief was not practical as each joint would have to be operated on. It was apparent that Dr. Patton thought the condition was the result of the aging process. He expressed the opinion that Waller should not be doing construction work and that as of May 23, 1978, Waller was permanently disabled from doing construction work as a pipe fitter.
It was Dr. Patton's belief that William Waller's degenerative spine disease had developed over the years and that he had a bad lumbar and cervical spine in 1977. He emphasized, however, that he had not had access to x-ray pictures prior to March of 1977 and did not see him until April of 1978. He agreed that Waller's condition, as it probably existed prior to the explosion, predisposed him to traumatic injury. It was Dr. Patton's opinion that in view of Waller's probable condition and age "that Waller would eventually have the same problems he has now whether he had ever had any accident at all, however, I couldn't deny that any accident he had could have speeded up the process." Dr. Patton testified that "given a man with Mr. Waller's degree of spondylosis, he was 61 when I first saw him [actually he was older], he probably would have been totally incapacitated within two or three years if he had never had an accident." (Dr. Patton's deposition, page 16) He stated he definitely agreed that any accident more probably than not accelerated the onset of Waller's symptoms. (Dr. Patton's deposition, pages 16 and 17) Dr. Patton further stated that it would only be a guess as to whether the speeding up of Waller's incapacity was due to the explosion accident or the automobile accident. (Dr. Patton's deposition, page 16)

CONCLUSION AS TO WILLIAM T. WALLER'S DISABILITY
A large part of the medical expert testimony relative to William Waller's back and neck problem is understandably inconclusive. All three physicians who testified concerning the back considered Waller to be incapacitated from doing pipe fitter work at some point of time. There was confusion between Dr. Cappel and Dr. Weiss after the automobile accident as to which physician was following Mr. Waller's back condition. Dr. Weiss apparently never examined Waller's cervical spine as a treating physician. *1114 Dr. Patton appears not to have had the benefit of any x-rays or history prior to March of 1977.
It is our conclusion from all the testimony that Waller was disabled as a result of the explosion which knocked him off a ten foot scaffold on March 9, 1977, at the plant of defendant, Farmland. It can hardly be denied that Waller's body was subjected to severe trauma in that accident. The medical testimony leads us to believe that it was more probable than not that the trauma sustained from the blast of the explosion and the subsequent fall on to the pipe and concrete base below aggravated Waller's pre-existing arthritic and degenerative disc disease. It is also our belief that, without accident, Waller would have arrived at the same state of disability within a very few years. Dr. Weiss was of the opinion that Waller was disabled both times he saw him in May of 1977. Although Waller put in substantial work time from September 1977 into May of 1978, his condition gradually worsened.
A fair and reasonable conclusion is that without the accident on March 19, 1977, Waller would have had approximately three years remaining to his work life. Since Mr. Waller was forced to cease work at approximately the end of April 1978, it would appear that his work life was shortened by approximately two years. In all likelihood, the explosion accident would have brought about this result and the trauma sustained in the automobile accident merely made eventual disability more certain.
In the year 1976 William Waller earned $26,785.00 as a pipe fitter. For eleven weeks in the months of January, February and through March 19, 1977, he earned $7,372.95 plus fringe benefits in the amount of $741.00, for a total of $8,113.95. Averaging this income to arrive at a weekly wage of $737.63 and projecting earnings for 52 weeks yields $38,356.85. On behalf of Waller it is suggested that we should make an award based on an annual income of $30,000. Considering that Waller's 1976 earnings were nearly $27,000 and wage increases, we consider the $30,000 to be a reasonable estimate. An annual wage of $30,000 amounts to average monthly earnings of $2,500 per month. Therefore, we will compute Waller's wage loss as follows:

1. March 19, 1977 to May 19,
 1978 (14 months at $2,500
 per month) $35,000.00
 Less earnings in 1977 and 1978:
 Earned at Pullman-Kellogg
 before first injury 8,113.95
 Earned at Redrock in 1977
 and 1978 6,624.20 14,738.15
 __________
 $20,261.85
2. Two years additional lost
 earnings 60,000.00
 ___________
 $80,261.85

For the foregoing reasons we will award William T. Waller the sum of $80,261.85 in actual and future lost wages.
As general damages to cover all of William T. Waller's injuries, the shock and pain and suffering experienced as a result of the injuries as well as any future pain, suffering, discomfort and limitation of physical capacity we will award the sum of $75,000.00.

DAMAGES OF DONALD JONES
Plaintiff-appellant Donald Jones suffered injuries similar to those of his co-worker, William Waller. Jones was twenty-six years old at the time of the explosion and fire at the Farmland plant and, fortunately, he did not suffer the permanent disabling type spinal injuries Waller did. Donald Jones was the crew member who lit the torch. The explosion and fire caused Jones to sustain burns, cervical and upper low back sprain and permanently impaired hearing with ringing in his ears. The medical prognosis is that his hearing will worsen at a much earlier age than would be normal.
Donald Jones was hospitalized for one week at Rapides General Hospital where Dr. Jack T. Cappel treated him for his burns. These were first and second degree burns about the face and ears. The burns were treated with topical cream and after healing left no permanent scarring. The burns healed by April 8, 1977.
*1115 On March 29, 1977, Jones complained to Dr. Cappel of discomfort in his lower back and right shoulders. Jones consulted Dr. T. E. Banks, an orthopedic specialist, on April 25, 1977. Dr. Banks diagnosed Jones' condition as subsiding cervical and lumbar strains with no bony injury. He was disabled from working at the time. On July 5, 1977, Dr. Banks advised Jones that he could return to work. Jones was still experiencing some discomfort but suffered no limitation of motion. Dr. Banks stated that upon returning to work Jones might have a period of adjustment in which he would experience stiffness and soreness because of lack of use of his muscles during his disability. The adjustment might last a few months. Although Jones experienced discomfort because of his back and cervical injury, it apparently was not of exceptional severity.
Dr. Joseph Villard, a specialist, treated Jones with reference to his hearing. Dr. Villard found that Donald Jones had a permanent impairment of his hearing of 75% of high frequency sound and 331/3% of his hearing as a whole. The impairment affected both ears. In addition Jones has a permanent ringing in both ears. On May 17, 1977, it was necessary for Dr. Villard to do a surgical procedure to drain fluid from one ear. In addition to the present hearing loss Dr. Villard stated that as Jones grows older his hearing will deteriorate at a much faster rate than it would normally for a man of his age.
In the eleven weeks of 1977 that Jones worked before the explosion accident, he earned an average of $630.84 per week including fringe benefits. His disability lasted from March 19, 1977, until July 5, 1977, a period of fifteen weeks. Assuming that his wages during that period would average $630.84, Jones' loss of wages amounted to $9,462.60. We will award this amount as actual past loss of wages. No future wage loss is involved.
As general damages to cover all of Donald Jones' injuries, the shock and pain and suffering experienced as a result of the injuries as well as any future pain, suffering, discomfort and limitation of physical capacity we will award the sum of $50,000.00.
The Travelers Insurance Company, as the workmen's compensation insurer of Pullman-Kellogg paid compensation to William T. Waller and Donald Jones. Travelers did not file a formal intervention in this case, but the parties entered into a written stipulation filed in the record covering Travelers' rights to recover reimbursement in the event of recovery by plaintiffs against defendant, Farmland Industries, Inc. The stipulation reads as follows:

"JOINT STIPULATION
Now into Court, through undersigned counsel, come William T. Waller and Donald Jones, plaintiffs herein, through their undersigned counsel, and Farmland Industries, Inc., defendants, and who agree to stipulate as follows:

1.
At all pertinent times herein, the Travelers Insurance Company was the workmen's compensation insurer for Pullman-Kellogg, Inc.

2.
That all pertinent times herein, Donald Jones and William Waller were employees of Pullman-Kellogg, Inc. and were working in the course and scope of their employment for Pullman-Kellogg at the time of the accident giving rise to the suit.

3.
That pursuant to its policy obligations, the Travelers Insurance Company paid to Donald Jones workmen's compensation benefits in the amount of $10,675 and medical benefits in the amount of $1841.02.

4.
That pursuant to its policy obligations, the Travelers Insurance Company paid to William Waller as of the date of trial on October 23, 1979 and is continuing to pay *1116 weekly benefits, and on the date of the trial had paid 135 weekly benefits in the amount of $12,825, and medical benefits in the amount of $3183.36.

5.
That stipulation is entered into in lieu of an intervention by the Travelers Insurance Company by agreement of all counsel that the Travelers Insurance Company is entitled to reimbursement of workmen's compensation benefits and medical expenses paid to Donald Jones and William Waller by the Travelers Insurance Company by preference and priority out of any judgment awarded to the plaintiffs herein, and, in the case of William Waller is entitled to credit against the future obligations for workmen's compensation in the event a judgment is rendered against defendant in excess of workmen's compensation benefits paid to date."
In view of the stipulation we will recognize the rights of the Travelers Insurance Company.

DECREE
For the foregoing reasons we affirm that portion of the trial court's judgment which dismisses the claims of plaintiffs William T. Waller and Donald P. Jones against Jewell Jackson; we also affirm that portion of the trial judgment which fixed the fees of the expert medical witnesses. We reverse that portion of the trial court's judgment which rejects the demands of plaintiffs against Farmland Industries, Inc., and which assesses the costs of court to plaintiff.
IT IS NOW THEREFORE ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff-appellant William T. Waller and against defendant-appellee, Farmland Industries, Inc., in the full sum of $158,445.21 together with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings including the costs of this appeal, less the amount awarded in the following paragraph to the Travelers Insurance Company.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of Travelers Insurance Company and against Farmland Industries, Inc. in the full sum of the amount that Travelers Insurance Company has actually paid, or will actually pay prior to the date of satisfaction of this judgment, to or on behalf of William T. Waller as weekly workmen's compensation benefits and medical expenses (which sum as of October 23, 1979 was $16,008.25), plus legal interest on the amount of each payment of such benefits which has been or will be made by the Travelers Insurance Company to William T. Waller from date of such payment until payment of the amounts awarded to this judgment, the sum to be paid the Travelers Insurance Company to be paid by preference and priority out of the award made herein to plaintiff, William T. Waller.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that such portions of the amount of the judgment herein in favor of William T. Waller which exceeds the amount which the Travelers Insurance Company is entitled to be paid shall be credited against any obligation which the Travelers Insurance Company may owe to William T. Waller for future workmen's compensation benefits, medical expenses, or otherwise occurring after the date of the satisfaction of this judgment; all in accordance with the provisions of LSA-R.S. 23:1103.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff-appellant Donald P. Jones and against defendant-appellee, Farmland Industries, Inc., in the full sum of $61,303.62 together with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings including the costs of this appeal, less the amount awarded in the following paragraph to the Travelers Insurance Company.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of Travelers Insurance *1117 Company and against Farmland Industries, Inc., in the full sum of $12,516.02, representing payment of weekly compensation benefits and medical expenses paid by Travelers Insurance Company to Donald P. Jones, together with legal interest on the amount of each payment of such benefits from date of each such payment until paid, the payment of which sum shall be paid in preference and priority over all sums due under this judgment in favor of plaintiff-appellant, Donald P. Jones.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
NOTES
[1] Farmland Industries, Inc. argues that the real reason that Pullman-Kellogg was requested to remove the blind was to avoid any labor union jurisdictional dispute. Farmland makes this assertion in connection with the contention that it could have done this work with is own personnel and therefore, removing the blind was a part of the trade, occupation or business of Farmland. Avoidance of labor problems may have influenced Farmland's decision to call on Pullman-Kellogg. Nevertheless, the testimony makes it clear that the work was the contractual responsibility of Pullman-Kellogg. In this respect Pullman-Kellogg had simply left a part of its work incomplete and was called back to rectify the deficiency. We find no merit to the contention that the removal of the blind was work within the trade, occupation or business of Farmland so as to make it the statutory employer of plaintiffs.
[2] The cause of action growing out of Waller's automobile accident before us on appeal bears docket number 7844 and is entitled William Thomas Waller v. American National Fire Insurance Company et al., and is reported at 392 So.2d 1117.
[3] Apparently Dr. Weiss made some cursory examination of William Waller's back on July 24, 1977, which was sufficient to permit him to express this opinion but was not extensive enough to justify him in giving a considered orthopedic opinion.