417 So.2d 1292 (1982)
Vernon L. LEWIS
v.
EXXON CORPORATION, et al.
No. 14984.
Court of Appeal of Louisiana, First Circuit.
June 29, 1982.
Rehearing Denied August 24, 1982.
*1293 Daniel L. Avant, John L. Avant, Baton Rouge, for plaintiff-appellant Vernon L. Lewis.
John B. Noland, Baton Rouge, for intervenor appellant Associated Indemnity Corp.
Glenn P. Marcel, Wendell G. Lindsay, Jr., Baton Rouge, for defendants and third party petitioners appellant Exxon Corp. and Robert D. Litt.
Wood Brown, III, New Orleans, for third party defendants-appellees H. E. Wiese and Aetna Ins. Co.
Gerald L. Walter, Jr., Baton Rouge, for defendants and third party defendants-appellees Tyler Pipe Industries, Inc. and Hartford Accident & Indemnity Co.
Before COVINGTON, LOTTINGER and LANIER, JJ.
*1294 COVINGTON, Judge.
This case was heard by the trial judge for several days extending over a period of several months. After considering the evidence and the applicable law, he assigned written reasons for judgment on March 20, 1981, and signed the judgment on April 10, 1981.
The judgment was in favor of defendants, Exxon Corporation and Robert D. Litt, Tyler Pipe and Hartford Insurance Company, and also in favor of third party defendants, H. E. Wiese, Inc., Aetna Insurance Company, Tyler Pipe and Hartford Insurance Company. Judgment was decreed in favor of the aforementioned defendants and against plaintiff, Vernon L. Lewis, dismissing his demand with prejudice; it was also decreed in favor of the third party defendants, dismissing the third party demands of Exxon Corporation and Robert D. Litt. The judgment also dismissed the intervention of Associated Indemnity Corporation, the workers' compensation carrier of Wiese.
The plaintiff timely moved for a new trial. Associated Indemnity Corporation, as workers' compensation intervenor, also moved for a new trial.
On May 15, 1981, the matter came on for hearing on the motions for new trial. Documentary evidence was introduced; the matter was then argued and submitted. The trial judge denied the motions, and assigned oral reasons for the denial.
Lewis took a devolutive appeal on May 18, 1981; subsequently, Exxon and Litt, and also Associated Indemnity Corporation, took devolutive appeals.
This suit arises out of an accident which happened on March 10, 1977, at the Exxon chemical plant in East Baton Rouge Parish. Vernon Lewis was employed as a pipefitter welder by H. E. Wiese, Inc., which had entered into a contract with Exxon to convert an existing ethanol unit to production of isopropanol. While Lewis was welding a flange on an eight-inch gas line in order to install a metering device, a seal plug, which had been inserted in the line to isolate a section thereof, blew out causing severe injuries to plaintiff's left arm and shoulder.
The eight-inch gas line involved was a line running from the Exxon refinery to the Exxon chemical plant, carrying gas from the refinery for use in the chemical plant. For internal accounting purposes, the refinery would bill Exxon chemical for the gas supplied. Since some of the gas, which was not used, was returned, Exxon needed a means of measuring the gas so that an accurate accounting could be made. The job that plaintiff (and the Wiese crew) was working on at the time of the accident was installing a metering device on the line for this purpose. Prior to the accident, a "hot-work permit" had been issued, certifying that the area in which Lewis was to weld was safe for that purpose, and that a test had been conducted to check for the presence of combustible gases in that area.
Shortly before the accident, a portion of the eight-inch line had been cut out after a nitrogen purge of the line. Apparently the purge did not effect a complete removal of gas from the line, so it became necessary to isolate the work area. The seal plug, weighing approximately 25 pounds, was used for this purpose, and it had been inserted just prior to plaintiff's welding of the flange. It was then, as plaintiff commenced welding, that the plug blew out, causing the injuries complained of in this suit.
In reaching its decision, the trial court found that Exxon was the statutory employer of Lewis under LSA-R.S. 23:1061, and as such entitled to tort immunity under LSA-R.S. 23:1032. The court below also found that neither Exxon nor Litt (nor any of Exxon's employees) committed an intentional tort within the meaning of LSA-R.S. 23:1032. Additionally, the trial court found that the negligence of Exxon and Robert D. Litt caused the injuries to Lewis, and that Exxon was not entitled to be indemnified by Wiese under their indemnity agreement.
On appeal, Lewis asserts that the trial court erred in finding that Exxon and Litt had carried their burden of proving that Exxon was a statutory employer of Lewis, *1295 and in finding that the injuries to the plaintiff were not the result of an intentional act. The plaintiff also contends on appeal that the court below erred in not addressing the issue of the constitutionality of LSA-R.S. 23:1032.
On the question of "statutory employer", or the so-called "Section Six defense", plaintiff argues that Reeves v. Louisiana and Arkansas Railway Company, 282 So.2d 503 (La.1973), is controlling; and that Blount v. Exxon Corporation, 395 So.2d 355 (La.App. 1 Cir. 1981), is supportive of a decision against Exxon's defense. At the trial, to prove its Section Six defense, Exxon presented the testimony of several witnesses, who testified as follows:
J. B. Arbour, division manager of the Exxon solvents and specialties plant in Baton Rouge, testified that Exxon was in the process of converting its existing ethanol facility to an isopropanol facility; and that the demand for ethanol had decreased, while that for isopropanol had increased, and the ethanol unit was old, all of which dictated management's decision to shut down the ethanol business and upgrade the isopropanol. He also said that Exxon had the supervisors, pipefitters, and welders available from its maintenance organization to do the job; however, it would have taken Exxon much longer to do the job without outside help, due to the fact that if this number of trained workers was utilized on the conversion project, they could not also operate the chemical plant. Arbour also testified that the work that Lewis was performing at the time of the accident was frequently done by Exxon employees.
Arbour testified that it cost about $17 million for the conversion of the facility from ethanol to isopropanol. If Exxon had built a new isopropanol unit from the ground up without any of the ethanol facilities being utilized, it would have cost about $42 million. Arbour further testified that the metering device would have been installed whether or not the ethanol unit had been converted to isopropanol, because the device "is something that we needed so that we could get credit for this volume of gas that we were selling to the refinery." He stated that he had issued a "hot-work permit" for the particular job.
Edward N. Boyle, Jr., head of Exxon's project development department, testified that about 20% of the planning and design man-hours for the conversion was done under his supervision; that his department contributed about 42,000 man-hours to the design; and that although four other firms also worked on the design, all of the work could have been done by Exxon employees if management had wanted to do it that way. He stated that Exxon had done other projects of similar size and nature.
Jack H. Woods, an Exxon employee in construction, testified that, as an engineer, he had supervised about twelve projects (both large and small) for Exxon. These projects included the Aldox unit, which enabled Exxon to manufacture cosmetic alcohols. The Aldox project was done with refinery personnel, beginning in 1961, taking about 15 months to complete, according to Woods.
A. E. Sharp, an Exxon employee in charge of planning and scheduling, testified that in 1970 he supervised the construction of a 12-story ethylene unit to replace one which had been damaged by fire. Virtually all crafts were engaged on the rebuilding of this unit, with total man-hours in excess of 100,000 being expended by Exxon personnel. This project was an emergency job, which utilized 12-hour shifts, 7 days a week, in order that the unit could be restored to operating condition as quickly as possible. About one-half of the workers came from the Exxon refinery and the other half from the Exxon chemical plant, a total of about 90 workers.
Paul E. O'Neill, an employee in Exxon's resource administration for construction department, gave testimony that indicated that Exxon employees were, to some extent, interchangeable between the refinery and chemical plants as management needed their services and crafts. They are cross-trained to do construction and maintenance work. They had 895-900 workers in his *1296 department. A complete set of crafts was available, including pipefitters, welders, machinists, boilermakers, etc. He testified that their functions were to maintain the Exxon refinery and do the project work as it was distributed to the workers. He said Exxon used about 125 workers on construction-type project work in 1977.
In rebuttal of Exxon's Section Six defense, plaintiff offered the testimony of Freddie McNabb, Jr., Wiese's superintendent at the Exxon job, to the effect that Wiese expended over 100,000 man-hours on the job; that no Exxon employees worked on the job; and that his employees were paid at a new-construction rate. He indicated that Wiese worked very closely with the Exxon people in determining the method to use for each of the tie-ins, and that Exxon was more familiar with the hazards. He stated that blinds furnished by Exxon were installed in the line by Wiese pipefitters. He had seen Wiese use seal plugs in similar applications prior to the accident. The plug used in the application that injured Lewis was furnished and installed by Wiese.
In response to the question, "Are you aware of any obligation on an Exxon employee to check the seal plug after it's installed to make sure it's installed properly?," Mr. McNabb said:
"No, sir. Other than the fact they make a gas test at that point to see if the thing is leaking."
McNabb further testified that Wiese went over the details of how the work was to be performed in advance of the performance and that what Wiese was going to be doing was gone over with the Exxon personnel. He stated that at any given point Wiese could stop work from being done if they suspected something was wrong. He said: "I'm sure that none of our people would want to see anyone get hurt." This was a conversion project for which Wiese had to supply very little material. The job required about 100,000 man-hours, utilizing nine different crafts (about 170-180 persons). The particular job that Lewis was performing at the time of his injury was "a part of the isopropanol expansion project covered by the contract between Wiese and Exxon."
Richard Gill, director of administrative services for Wiese, also testified for the plaintiff. In substance, he stated that "This project was handled as new construction." The trial judge observed that Gill indicated that "Wiese supplied little if any new materials for this job."
After reviewing this testimony, the trier of fact stated:
"This evidence convinced the Court that Exxon not only had the manpower and expertise available to construct the entire project but had done similar projects in the past. This Court feels that the work undertaken by Wiese was not new construction but the conversion of one process for another. Substantial materials were not necessary; only the required labor to change a manufacturing process from ethanol to isopropanol. See Reeves v. Louisiana & Arkansas Railroad Company, [sic] 282 So.2d 503 (La.1973). The burden of proof is upon the defendant to establish by a preponderance of evidence that the work being performed by Wiese was a part of its regular trade, business or occupation. The Court feels that Exxon has carried its burden in this case."
LSA-R.S. 23:1061 provides, in part:
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his defendant, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the *1297 principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed."
LSA-R.S. 23:1032 provides, in part:
"The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this Section, the word `principal' shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.
"Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act."
An employee of a contractor cannot maintain a tort action against the contractor's principal for an accident that occurred during the course of work that was a part of the principal's business; his exclusive remedy is in workers' compensation. Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950); Traylor v. Shell Oil Company, 400 So.2d 342 (La.App. 4 Cir. 1981), writ denied, 405 So.2d 530 (La.1981); Moses v. Vulcan Materials Company, 388 So.2d 117 (La.App. 1 Cir. 1980), writ denied, 392 So.2d 1058 (La.1980); Malone-Johnson, 13 Louisiana Civil Law Treatise, Workers' Compensation Law and Practice, § 128, p. 263 (1980).
In Vincent v. Ryder Enterprises, Inc., 352 So.2d 1061, 1068 (La.App. 3 Cir. 1977), the Court of Appeal set forth criteria for ascertaining whether a defendant was a statutory employer within the contemplation of LSA-R.S. 23:1061, as follows:
1) There must exist the relationship of principal and contractor;
2) There must be a contract between the principal and contractor for the execution by the contractor of the whole or a part of the work being undertaken by the principal;
3) The work which is the subject of the contract must be a part of the principal's trade, business, or occupation; and
4) The plaintiff must be performing the contractual work at the time of his injury.
We believe that the foregoing criteria flow from the requirement of LSA-R.S. 23:1061 that the work being performed is part of the principal's trade, business, or occupation. See Reeves v. Louisiana and Arkansas Railway Company, supra, where the Court held that a principal is not classified as a statutory employer if the work engaged in is a "new construction", or is work not customarily performed by the principal or other employers similarly situated. See 282 So.2d at 508. In the Reeves case, the work being done at the time of the accident (construction of a new coking unit on the premises of the principal) was not a part of the principal's business (it was primarily an operating or refining company). It never designed a coking unit or any comparable plant. It did not have the design capability or manpower availability for that particular type of work. Most of its new construction was contracted out to independent contractors. A majority of its mechanically-trained employees were engaged in maintenance work. See also Waller v. Farmland Industries, Inc., 392 So.2d 1099 (La.App. 3 Cir. 1980), writ denied, 399 So.2d 600 (La.1981); a new plant for a fertilizer manufacturer, which had been designed by and was being built by the contractor, was still in the process of being constructed, though nearing completion; the contractor's injured employee was not a statutory employee of the principal.
*1298 In applying the above test for "statutory employment" the Court, in Thompson v. South Central Bell Telephone Company, 402 So.2d 799 (La.App. 4 Cir. 1981), found that the phone company was a statutory employer, observing as follows:
"It is clear that South Central Bell's regular trade, business or occupation is that of providing telephone service to subscribers. It is also clear that a necessary part of this business is the construction and maintenance of underground telephone transmission lines. The laying of conduit to encase the underground transmission cables is obviously an essential and integral part of the telephone company's business.
"The mere fact that South Central Bell does not do the excavation or the laying of the conduit itself with its own employees, but rather chooses to contract that portion of the work out does not prevent the labor from being part of its regular business. See Barnes v. Sun Oil Co., supra. [362 So.2d 761 (La.1978)]. As we held in Gray v. Louisiana Power and Light Company, 247 So.2d 137 (La.App. 4th Cir. 1971), writ refused, 259 La. 59, 249 So.2d 202 (1971), an electrical utility company's decision to contract with another company for the construction of foundations for towers supporting overhead transmission lines did not preclude the electric company from being a `statutory employer' of the contractor's employee where the utility was authorized to manufacture and produce electricity and the means to transmit it to its users. "We are aware of various cases holding that construction of a `new facility' is not part of the trade, business or occupation of the concern who is to use the facility. In Reeves v. Louisiana and Arkansas Railway Company, 282 So.2d 503 (La. 1973), the construction of a `coking unit' was held not to be the regular business of the owner and operator of an oil refinery and chemical plant where it was not the owner's business to engage in new construction of this type or magnitude and it had never designed a coking unit or any comparable plant. See also, Waller v. Farmland Industries, Inc., 392 So.2d 1099 (La.App. 3rd Cir. 1980) and the cases cited therein. Likewise, a major reconversion of one type of alcohol production facility to another type has been held not to be part of the regular business of a company where it did not regularly so convert the facilities of its chemical plant. See Blount v. Exxon Corp., 395 So.2d 355 (La.App. 1st Cir. 1981).
"The excavation of a street and laying of telephone conduit in our case, however, is not a `new construction' within the meaning of the cited cases. Ours is not a case where a new plant is being constructed en toto for the principal or where the construction is not part of the principal's regular business. Moreover, the telephone company did not rely wholly on the expertise of the contractor to design and construct the system. On the contrary, South Central Bell designed the conduit, drafted the excavation contract, and furnished Cifers with plans, specifications and materials, including the conduit, for performance of the work. The aforementioned cases are therefore distinguishable.
"Under these circumstances, we conclude Thompson was injured while performing contractual work that was part of South Central Bell's regular business." [Footnote omitted.]
In Barnes v. Sun Oil Company, 362 So.2d 761 (La.1978), a welding company employee sued an oil company (Sun) for injuries sustained while repairing a gas flow line. The defendant was engaged in the exploration, drilling, production, transportation, manufacture, and marketing of oil, gas and other petrochemicals. The particular facility involved in the accident was used to engage in the production and processing of oil and gas through wells, compressor stations, heaters, pipelines, separation equipment, and other related equipment. The work in which the contractor and its employees were undertaking consisted of repairing and maintaining glycol units, separators, reboilers, compressors, heaters, pumps, and valves, and maintaining and repairing gas lift and gas flow lines. The continuous *1299 maintenance and periodic repair of the gas flow lines was essential for oil and gas to flow from wells to the production facility (otherwise its purpose could not be fulfilled). All major oil companies performed this kind of work with their own employees. Formerly, the defendant oil company had also used its own employees to perform the services in question. However, due to economic feasibility, job-site location, number of work hours, and other related variables, the oil company contracted out this particular maintenance and repair work, including welding, fitting, changing, and salvaging pipe. There was also evidence of some supervisory function over the contractor's work by the principal, and that the oil company continued to use its own employees to do similar work at other similar facilities. In finding that the principal was, under the circumstances, the statutory employer of the injured employee, the Supreme Court held:
"[I]t is not disputed that the work consisted of repair and maintenance services performed regularly as an essential and integral part of Sun's business. The parties agree that Sun does not perform these tasks at Sweet Bay Lake with its own employees. However, this fact alone does not prevent the labor from being part of its regular business. The effect of La.R.S. 23:1061 is that the principal shall be considered the employer of the employees of the contractor engaged in work which is part of the regular business of the principal. Broussard v. Heebe's Bakery, Inc., 263 La. 561, 268 So.2d 656 (1972)."
We find that Blount v. Exxon Corporation, supra, is not apposite. The trial court in Blount had sustained the principal's motion for summary judgment and this Court, finding that the evidence in the record failed to show that the principal "regularly engaged in the business of converting its production facilities from one type of unit to another", reversed and remanded for further proceedings. The instant case was tried on the merits, and the trial court found that the principal, Exxon, did in fact regularly engage in the business of converting its production facilities from one type of unit to another type, such as was done in the present case, as a part of its trade, business or occupation of operating a chemical plant and refinery. On this issue, the trial judge said:
"The evidence in this record indicates that Exxon has done so in the past and can do so in the future whenever it so desires. The rebuilding of the burned 12-story EPLA process and the construction of the Aldox unit are two examples. When the economics of a given situation so dictate Exxon with its own employees and own resources will construct any project of any magnitude at this plant."
We do not find that the trial court committed manifest error in making this factual finding; we will not disturb its finding. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Our review of the record convinces us that the evidence offered by Exxon sustains its burden of proof. The evidence of Exxon's prior activities shows that the Wiese contract work was part of Exxon's trade, business, or occupation within the meaning of LSA-R.S. 23:1061. Exxon's business was the operation of a chemical plant and refinery, and it operated its business to include necessary maintenance and repair, renovations, expansions, modifications and conversions. The record reveals that Exxon had the design capability and the manpower availability to do this project. The evidence shows that Exxon did perform the same type of work with its own employees as part of its business. This conversion of an ethanol unit into an isopropanol unit was not a new construction. The project was not a redesign or reconstruction of Exxon's facilities at this plant site; it was an upgrading of existing facilities. Moreover, the particular job that Lewis was performing at the time of the accident, i.e., welding a flange as part of an orifice run (metering device) was a job that Exxon would have done whether or not it undertook the conversion project, since it was necessary to meter the gas for accounting purposes. We find that the trial court correctly concluded *1300 that the work being done by plaintiff and other Wiese employees was a part of Exxon's business, essential to the efficient operation of the plant. The activity in which Lewis was engaged was a part of the trade, business or occupation of Exxon within the meaning of LSA-R.S. 23:1061, with the concomitant result that Exxon was immune from tort liability to the plaintiff. See Brown v. Kaiser Aluminum and Chemical Corporation, 289 So.2d 524 (La.App. 1 Cir. 1973), writ denied, 293 So.2d 171 (La.1974).
Lewis also asserts that the trial court erred in finding that the injuries sustained by appellant were not the result of an intentional act within the meaning of LSA-R.S. 23:1032. On this point, the plaintiff contends that his claim on the basis of "intentional acts" was based on specific acts of negligence, which are set out in his brief on appeal, as follows:
"a. In improperly testing the 8" line for the presence of combustible gases;
"b. In improperly preparing the line for welding in that certain lines leading into the 8" line had not been disconnected or blanked off in the proper way nor were the proper blinds inserted therein;
"c. In furnishing a defective plug in that the breathing tube and hole were obstructed;
"d. Alternatively, in requiring petitioner to weld on a line containing hydrocarbons or other explosive mixtures with the use of a gas plug which was not necessary in the premises and in failing to open the line and steam it out prior to ordering petitioner to weld thereon which could have been done and in fact, was done after the accident;
"e. In failing to advise Exxon personnel, including the section supervisor, Robert D. Litt, and in failing to advise petitioner that in 1975 it had been determined that the use of gas plugs in welding operations on lines containing hydrocarbons was highly dangerous and hazardous because of a possible spark plug effect between the metal disc components of the plug and the interior wall of the pipe;
"f. In failing to establish proper safety procedures for the use of gas plugs in such welding process in the event the use of plugs was mandated because of special circumstances."
Appellant Lewis then reviews the record in considerable detail by quoting extensively from the transcript of the testimony, particularly the testimony of Robert D. Litt. Lewis urges that from this evidence Exxon and Litt knew that the injuries to plaintiff were substantially certain to follow; that said defendants "deliberately and purposely engaged in a persistent course of conduct with full knowledge of the risks involved and in obvious and repeated disregard of the consequences." The appellant then submits that:
"The evidence establishes beyond any doubt that Exxon intended to use a procedure involving the known risk that an explosion might occur. They intentionally did this, not once, but as a matter of routine. Ergo Exxon knew that an explosion was inevitable. Exxon also knew that if an explosion occurred, `controlled' or not, there was a substantial likelihood of injury. Therefore Exxon generally intended, within the meaning of R.S. 23:1032, that there be an injury." (Emphasis omitted.)
The trial court, relying upon Bazley v. Tortorich, 397 So.2d 475 (La.1981), found no merit in plaintiff's assertions on this question. We agree. In his written reasons, Judge Shortess stated:
"Plaintiff presented no evidence from which this Court can infer that Litt or any other Exxon employee desired to injure plaintiff or that anyone from Exxon knew or was substantially certain that plaintiff would be injured as a result of the use of the plug. See Prosser Restatement of Torts, Section 8, page 32, `... the mere knowledge and appreciation of the risk short of substantial certainty is not the equivalent of intent. The defendant *1301 who acts in the belief or consciousness that he is causing an appreciable risk of harm to another may be negligent and if the risk is great his conduct may be characterized as reckless or wanton, but it is not classed as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. Apparently the line has been drawn by the court at the point where the known danger ceases to be only a foreseeable risk at which a reasonable man would avoid and becomes a substantial certainty.' This seal plug had been used on many occasions in the past without a problem. While it was an unsafe use, it is impossible for this Court to characterize this improper use as an intentional tort under the rationale of Bazley."

The controlling case on the meaning of "intent" is Bazley v. Tortorich, supra. In Bazley the plaintiff was struck and injured by a passing motor vehicle while getting on the back of a garbage truck in the course and scope of his employment. He claimed that the "intentional" acts of his co-employees in operating the truck without a horn, in disregarding certain mechanical standards, in failing to maintain a proper lookout, and in failing to stop in a place of safety without warning caused his injuries. There were no facts showing that his co-employees desired the consequences of their acts, or that such consequences were substantially certain to follow from such acts. The plaintiff in Bazley suggested that "intentional act" was to be equated with "voluntary act", so that an injured employee could sue in tort for a voluntary act setting in motion events leading to his injury even if the resulting injury did not appear likely or was not apparent to the tortfeasor. The Bazley Court rejected this suggestion as follows:
"The meaning of intent in this context is that the defendant either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did."
Thus, we see that mere knowledge of, or appreciation of, a risk, short of substantial certainty, is not to be equated with intent. While the line between intentional act and negligent act may be a matter of degree, the courts have drawn the line at the point where the known danger goes beyond being only a foreseeable risk which a prudent person would avoid, and becomes a substantial certainty.
There is no evidence to show that Exxon intentionally selected the wrong procedure, or that these consequences were substantially certain to follow from the acts of plaintiff's co-employees. In fact, Arbour testified:
"Let me say then, we would not have proceeded at all with this job if we felt there was any possibility of it not going right. That's not our intent. At the time this job was planned and executed the people planning it had the utmost confidence that it was going to go successfully or they wouldn't have done it...."
Next, Lewis contends that the trial court erred in failing to consider the issue of constitutionality of LSA-R.S. 23:1032.
It was expressly held in Bazley v. Tortorich, supra, that the exclusive remedy rule of LSA-R.S. 23:1032 does not violate the rights of an injured employee to substantive due process and equal protection of the laws, or other constitutional safeguards. Appellant does not seriously quarrel about the constitutionality of the exclusive remedy provisions of the act and the amending act as established by Bazley; however, he does attack their constitutionality insofar as they apply to him as an employee of an independent contractor seeking recovery from a negligent employee of the principal. In his argument, the appellant states that "Litt (principal's employee) is immune to claims by Lewis (contractor's employee), but Lewis is not immune to claims by Litt. None of the decisions of the Courts of Appeal or the Supreme Court including Bazley v. Tortorich, supra, concerning the constitutionality of Act 147 of 1976 have addressed this problem. Every such case has dealt *1302 with claims by an employee against an officer or employee of the same employer."
The argument of appellant Lewis is premised on the assumption that he cannot sue Litt in tort, but that Litt could sue him in tort. The assertion that Litt could sue appellant in tort is not borne out by the law. Since Lewis is considered the "statutory employee" of Exxon, he and Litt are co-employees of Exxon. "Co-employees", according to LSA-R.S. 23:1032, may not maintain a suit in tort against each other. This is the precise holding of the Court of Appeal, Third Circuit, in Johnson v. Alexander, 406 So.2d 1378 (La.App. 3 Cir. 1981). In Johnson, Vincent (the principal) contracted with Dupont (the contractor) to assist in laying firelines in the Continental plant. Plaintiff, an employee of Vincent, was injured when Alexander, an employee of Dupont, negligently handled a forklift. The Johnson Court concluded that the suit could not be maintained, stating:
"Alexander avers that since he is a `co-employee' of the plaintiff by virtue of his statutory employer-employee relationship with plaintiff's employer, the instant suit is barred by virtue of LSA-R.S. 23:1032 which prohibits suits in tort as between co-employees.
"Although LSA-R.S. 23:1032 and 1061 do not clearly provide that a statutory employee becomes a co-employee of all of the regular employees of the statutory employer, it appears to us that this status is necessarily intended by those cited sections of Louisiana's Workmen's Compensation Act.
"LSA-R.S. 23:1032 explicitly provides that the rights and remedies granted via the Louisiana Workmen's Compensation Act to an injured employee are exclusive of all other rights and remedies (e.g. suits in tort) `... against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal...'. However, the aforesaid statute does not provide for the particular factual situation presently before this court. In the instant case, a regular employee of defendant Alexander's principal (also, plaintiff's employer) is suing his employer's statutory employee and such statutory employee's general employer and its liability insurer. The language of LSA-R.S. 23:1032 provides for the more common situation where the statutory employee is injured on the job while in the employ of his special employer by providing that the injured statutory employee can sue neither his statutory employer nor the regular employees of his statutory employer in tort. For example, in the instant case, Vincent is the regular employer of Johnson and the principal of Alexander. Clearly, if Alexander had been hurt he could not bring a tort suit against Johnson because under Section 1032 the rights and remedies granted under the Workmen's Compensation Act are exclusive of all other rights and remedies against an `employee of his employer or principal.' However, the aforesaid statute is silent in regard to the right of a regular employee of a principal to sue the principal's statutory employees in tort. Although as far as we have been able to determine, this particular issue is res novo, in our view it would be incongruous to hold that the provisions of LSA-R.S. 23:1032 would bar suits in tort by a statutory employee against the regular employees of the principal but would not bar suits in tort by the regular employees of the principal against statutory employees of the principal. Thus, we conclude that when an employee acquires the status of a statutory employee by application of the provisions of LSA-R.S. 23:1061, he becomes a co-employee vis-a-vis the regular employees of the principal within the intendment of Section 1032. Therefore, we determine that since Alexander was a statutory employee of plaintiff's employer, Vincent, he, thus, became a co-employee of Johnson. Since the explicit language of LSA-R.S. 23:1032 prohibits suits in tort as between co-employees, we conclude that the plaintiff may not maintain the instant suit against Alexander." (406 So.2d at 1385).
We thus conclude there is no merit in Lewis' contention that LSA-R.S. 23:1032, as amended, is unconstitutional.
*1303 The intervenor's suit and appeal, which are contingent upon the plaintiff's right to recover, must necessarily fail also. Bell v. Carolina Casualty Insurance Company, 227 So.2d 171 (La.App. 2 Cir. 1969), writ refused, 255 La. 151, 229 So.2d 733 (1970).
We now turn to Exxon's contention on appeal that Wiese is liable to Exxon for its cost of defense under their indemnity agreement. The trial court found that Wiese was not liable because of the negligence of Exxon and its employee, Litt. Basically, Exxon's argument is that the indemnity agreement only excludes those claims which are caused by Exxon's sole negligence, not by its concurrent negligence. The indemnity agreement, in pertinent part, provides:
"Contractor shall defend, indemnify and save Owner, its officers, employees, agents and representatives harmless from all claims for injuries to or death of any and all persons, including without limitation, employees, agents and representatives of Contractor or its subcontractors, arising out of or in connection with or by reason of work done by Contractor, its employees, agent, representatives, or subcontractors under this contract, expressly excepting claims for injuries or death caused by the sole negligence of Owner, its officers, employees, agents, and representatives."
The negligence of Exxon and Litt is established by the record. Litt testified that it was his decision to use the seal plug. The expert evidence, particularly that of Dr. Mehdy Sabbaghian, a mechanical engineer, convincingly shows that under the circumstances of the instant case it was negligence to use that plug. On the question of the negligence of Exxon and Litt the trier found:
"The Court feels that Exxon and its supervisor, Robert D. Litt, were guilty of negligence or fault which caused the damage sustained by Lewis. Exxon is a multi-national corporation, probably the largest in the world. It has tremendous resources available to it. It was ludicrous for Exxon to permit the technique that was used in this case within its plant. The plug used was apparently sold and possibly manufactured by the Tyler Pipe Industries, Inc. Robert Blakely, Tyler's district sales manager, called the plug a wing nut test plug. He indicated that this plug was used by plumbers and sold in plumbing supply houses. This test plug was designed for use to verify whether the welds in sewer lines had been properly made. It was not designed for use in a hydrocarbon environment with combustible materials. The seal plug theory may have been a good one but to properly implement it requires the use of [of] plug designed for the chemical industry. A plumber's helper won't do."
There was no manifest error in this finding. There is ample evidence in the record to support the conclusion that the accident was caused by the negligence of Exxon and its employee, Litt.
The trial court held that the quoted language in the agreement excludes indemnity for the consequences of Exxon's negligence. We agree; Exxon was at fault. Therefore, under the express language of the indemnity agreement, there can be no indemnification.
An indemnity agreement whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed; such agreement will be construed so as not to indemnify one against losses resulting to him through his own negligence, unless the agreement, in unequivocal terms, expresses an intention to indemnify against the indemnitee's own negligence. Strickland v. Nutt, 264 So.2d 317 (La.App. 1 Cir. 1972), writ refused, 262 La. 1124, 266 So.2d 432 (1972); Breaux v. Rimmer & Garrett, Inc., 320 So.2d 214 (La. App. 3 Cir. 1975). The present agreement does not provide indemnification to Exxon for the consequences of its sole negligence. Rather, the agreement expressly excepts claims for damages caused by the sole negligence of Exxon. Therefore, it cannot recover its attorney fees. See Southern Pacific Transportation Company v. National Molasses Company, 396 So.2d 451 (La.App. 4 Cir. 1981).
*1304 Nevertheless, Exxon likens the indemnitor's duty to defend to that of an insurer's duty to defend, and urges us to accept the same test: the test to determine an insurer's duty to defend is to examine the petition under the assumption that all allegations contained therein are true; and, if, upon such examination there appears to be coverage under the policy and liability to the plaintiff, the insurer of the defendant is obligated to defend, regardless of the ultimate outcome of the case. Only if the policy unambiguously excludes coverage does the insurer not owe the duty to defend. See West Brothers of DeRidder, Louisiana, Inc. v. Morgan Roofing Company, Inc., 376 So.2d 345 (La.App. 3 Cir. 1979).
In the instant case it is clear from the language of the agreement that the parties contemplated that the contractor was to reimburse the principal only after liability had been determined and only in the event the liability did not result from the principal's sole negligence. This situation cannot be equated with the situation arising under an insurance policy requiring the insurer to defend lawsuits against the insured. Obviously, the parties did not intend that where Exxon claims the accident was at least concurrently caused by Wiese that Wiese, under the agreement, is forced to side with Exxon and establish its own negligence. Polozola v. Garlock, Inc., 376 So.2d 1009 (La.App. 1 Cir. 1979), cited by Exxon on this question, is factually distinguishable. In Polozola, the Court found that the contractor had agreed to indemnify the principal for the consequences of the principal's own negligence (sole or concurrent). That is not the present case; here Wiese did not obligate itself to indemnify Exxon for the consequences of Exxon's own negligence. We hold that this contract does not unequivocally provide for indemnity to Exxon for its own negligence. The courts have not permitted the enforcement of an intention to be indemnified for the consequences of one's own negligence in the absence of a specific articulation to that effect. Breaux v. Rimmer & Garrett, Inc., supra.
For the reasons assigned, we affirm the judgment appealed. Costs of this appeal are to be borne equally by Vernon L. Lewis and Exxon Corporation.
AFFIRMED.

ON APPLICATIONS FOR REHEARING.
Rehearings Denied. Appellant's application for rehearing raises no new issues which were not briefed and fully considered by this Court in its original opinion. It is true that Thompson v. South Central Bell Telephone Company, 402 So.2d 799 (La.App. 4 Cir. 1981), which this Court cited on the question of "statutory employer" has been reversed and remanded by our Supreme Court, 411 So.2d 26 (La.1982). However, wholly disregarding Thompson, we adhere to our original decision.
In the case at bar, the suit was tried on the merits, and the defendant presented enough evidentiary facts to convince the trier of fact that the work performed by H. E. Wiese, Inc., the primary employer of Vernon Lewis, was part of the trade or business of Exxon Corporation.